STATE OF NORTH CAROLINA v. THOMAS FULTON, JR.

No. 99

(Filed 5 March 1980)

1. **Criminal Law § 61— comparison of shoe tracks—non-expert testimony—harmless error**

    The trial court erred in permitting a police officer who was not qualified as an expert witness to state his opinion that the tread design shown in a photograph of shoe tracks found near the crime scene was the same as the tread design on defendant's tennis shoes since the jury was as well qualified as the witness to draw inferences and conclusions from the facts the witness stated in his opinion; however, such error was harmless beyond a reasonable doubt where the State offered testimony by an S.B.I. agent who was an expert in shoe track comparison that shoe tracks near the crime scene and the track design on defendant's tennis shoes were similar.

2. **Criminal Law § 71— shorthand statement of fact**

    Where an officer testified that he entered defendant's vehicle when he first discovered it, started the motor and moved the vehicle backward and forward, and that the vehicle was parked on an incline, the officer's subsequent testimony that defendant's vehicle could have drifted downhill to the new location where the officer found it "even without power steering and brakes" constituted a permissible shorthand statement of facts within the officer's own knowledge rather than opinion testimony.

3. **Criminal Law § 55.1— type of blood on defendant's shoes—blood type of victim—percentage of persons having that type—weak probative value**

    In a prosecution for armed robbery and felonious assault, testimony by an expert in forensic serology that human blood found on defendant's tennis shoes was consistent with the victim's blood grouping or blood type and that this particular blood type was present in only 11% of the population of the United States was only weakly probative in character but was harmless because its probative value was so minute and exclusion of the testimony could not have changed the result of the trial.

4. **Criminal Law § 42.6— chain of custody of shoes sent to S.B.I. laboratory**

    The chain of custody of defendant's tennis shoes after they were received in the mail by an S.B.I. agent was not broken so as to require the exclusion of tests of bloodstains on the shoes because the S.B.I. agent may have left the shoes unattended for an hour in his unlocked private office or because the shoes were carried to a mail pickup point by some employee of the S.B.I. laboratory other than the S.B.I. agent after they had been examined where the S.B.I. agent testified that upon receiving the shoes he immediately marked them with his initials, the date of receipt, and S.B.I. file number; within an hour after receiving the shoes he examined them and then placed them in a locked file cabinet until he got ready to dictate the case; the shoes were repackaged and mailed to the officer who had sent them to the S.B.I. the next

day; and the markings on the shoes introduced into evidence were those made by the S.B.I. agent and the shoes were the same shoes the agent had received and sent out.

DEFENDANT appeals from judgments of *Walker (Hal H.), J.,* 21 May 1979 Criminal Session, FORSYTH Superior Court. This case was docketed and argued as Case No. 127 at the Fall Term 1979.

Defendant was tried upon separate bills of indictment charging armed robbery and assault with a deadly weapon inflicting serious injury.

The State's evidence tends to show that at 12:30 a.m. on the night of 7 February 1979, a black male entered the Family Grocery at 805 Akron Drive in Winston-Salem, stuck a gun in the back of Sammy Agha, the owner, and demanded money. Mr. Agha opened the cash register and the robber struck him in the head with the pistol, inflicting wounds which required surgery and hospitalization. The robber was wearing white tennis shoes, dark pants, white sox, and a stocking over his head. During the robbery, Mr. Agha activated an alarm which notified the police. The robber took about $300.

Officer Everhart was investigating a 1967 Chrysler parked on the side of the road near the Family Grocery when he received a call concerning the robbery. He took the keys to the Chrysler with him and went to the Family Grocery. There was a grey cap and a tan jacket on the passenger side of the Chrysler which the officer left there. When he arrived at the Family Grocery, Mr. Agha told him he had been robbed by a black man wearing black pants, white sox and a black jacket. Twenty to thirty minutes after receiving the call, Officer Everhart saw defendant walking in the vicinity of the Family Grocery. Defendant ran and Officer Everhart and two other officers chased him into an apartment building and arrested him outside the apartment occupied by defendant's sister. At the time of arrest, defendant was wearing a *tan jacket*, black pants, white sox, and white tennis shoes with blood on them. He had $248.58 in his possession and was unarmed. The officer returned to the Chrysler and found it had been moved and the tan jacket and cap were gone. A stocking mask was found behind the house the Chrysler "had been sitting in front of."

Photographs of footprints found near the Family Grocery were taken and mailed, along with defendant's tennis shoes, to the S.B.I. laboratory in Raleigh on 16 February 1979 for footprint analysis. Officer Everhart testified over objection that the design of the tracks in the photo taken at the scene of the crime was the same as the tread design on defendant's shoes. An S.B.I. agent, expert in shoe track comparison, testified that in his opinion the footprint impressions were consistent with the soles of the tennis shoes.

On 10 April 1979, the tennis shoes were again sent to the S.B.I. laboratory in Raleigh for an analysis of the alleged blood stains on them. An S.B.I. agent testified that human blood on the tennis shoes was consistent with the blood grouping or blood type of Mr. Agha and that this particular blood type was present in only 11% of the population of the United States.

Defendant offered evidence and testified in his own behalf. He said the Chrysler belonged to him; that he had visited his sister on the night in question and, upon leaving her apartment, had trouble steering his car; that he parked it alongside the road and left on foot to get some power steering fluid at a filling station; that he failed to find it, returned to his car where he put his coat on, reached for the key and found it missing; that he thought he had left the key in the car, was looking around the area trying to find it, decided to return to his sister's apartment and was arrested there. Defendant said he was wearing black jeans on the night in question. He further testified that his mother had died within the last year and he had received a check for $1,700. He said he had the $248 which was found on him "folded behind my billfold . . . in my right pocket, back pocket, right behind my billfolder. There was a whole lot of $5 bills in there . . . ."

The jury convicted defendant of armed robbery and assault with a deadly weapon inflicting serious injury. He was sentenced to a term of not less than forty years nor more than life imprisonment for the robbery and not less than five nor more than ten years for the felonious assault, to run consecutively. He appealed both sentences. We allowed a motion to bypass the Court of Appeals in the felonious assault case to the end that all charges against defendant received initial appellate review in this Court. Errors assigned will be discussed in the opinion.

*Rufus L. Edmisten, Attorney General, by William W. Melvin, Deputy Attorney General for the State.*

*Larry G. Reavis, Attorney for Defendant-Appellant.*

HUSKINS, Justice.

[1] The court permitted Officer Everhart, over objection, to state his opinion that the tread design shown in the photograph of the shoe tracks which were found near the Family Grocery and the tread design on the bottom of defendant's tennis shoes were identical. This constitutes his first assignment of error.

Officer Everhart was not qualified as an expert witness in the field of latent evidence identification. He was, however, a trained police officer who had participated in the investigation of the armed robbery of Family Grocery and was the officer who found the shoe tracks in the field behind the store. Even so, we are discussing opinion evidence of a non-expert witness.

Ordinarily, opinion evidence of a non-expert witness is inadmissible because it tends to invade the province of the jury. "The essential question in determining the admissibility of opinion evidence is whether the witness, through study and experience, has acquired such skill that he is better qualified than the jury to form an opinion as to the subject matter to which his testimony applies." *State v. Phifer,* 290 N.C. 203, 225 S.E. 2d 786 (1976), *cert. denied,* 429 U.S. 1123 (1977). *Accord, State v. Mitchell,* 283 N.C. 462, 196 S.E. 2d 736 (1973). Whether a witness has the requisite skill to qualify him as an expert is, nothing else appearing, a question within the exclusive province of the trial judge. *State v. Combs,* 200 N.C. 671, 158 S.E. 252 (1931).

Here, no effort was made to qualify Officer Everhart. It follows, therefore, that his opinion was inadmissible because the jury was apparently as well qualified as the witness to draw the inferences and conclusions from the facts that Officer Everhart expressed in his opinion. *Wood v. Insurance Company,* 243 N.C. 158, 90 S.E. 2d 310 (1955); *State v. Cuthrell,* 233 N.C. 274, 63 S.E. 2d 549 (1951).

Although the trial court erred in permitting Officer Everhart to express his opinion that "the design on the dirt and the design

on the bottom of the tennis shoes were the same," we are of the opinion that defendant was not prejudiced by the error because the State offered expert testimony through S.B.I. Agent Layton that the shoe tracks near the crime scene and the track design on defendant's tennis shoes were similar. Agent Layton said, "it is my opinion that the sole impression or track design on the base of State's Exhibit No. 11 (defendant's tennis shoes) is consistent with the shoe track impression represented on State's Exhibits 8(a), 8(b) and 8(c)." These latter exhibits are photos of shoe tracks in the field near the Family Grocery operated by Mr. Agha. We hold that admission of Officer Everhart's opinion testimony was harmless error beyond a reasonable doubt.

[2] Defendant further complains in his first assignment of error that the court erred in permitting Officer Everhart to testify that defendant's Chrysler could have been drifted downhill to the new location where the officer found it "even without power steering and brakes." Defendant contends this constitutes impermissible opinion testimony. We find no merit in this contention. The officer had previously testified that he had entered the vehicle when he first discovered it, had started the motor and moved the vehicle backward and forward. At that time the vehicle was parked on an incline. Thus, the officer had personal knowledge that the vehicle was not completely disabled and any driver could permit it to drift down the incline without power steering or power brakes. Hence, it is more accurate to say that the officer was giving a shorthand statement of facts within his own knowledge rather than expressing his opinion. Defendant's first assignment of error is overruled.

[3] Laura J. Ward, a member of the S.B.I. and an expert in the field of forensic serology, testified that examination of defendant's tennis shoes revealed the presence of human blood; that the blood type of Mr. Agha was group A, PGM type 1 and Hp type 2-1; that the blood on defendant's tennis shoes was group A, PGM 1, Hp 2-1. The witness then explained her answer as follows: "There are numerous blood groups or blood group systems present in the blood. The ABO system is the one that is most commonly recognized. You can be either a Group A, Group B, Group O, or Group AB. However, there are numerous other blood group systems present that are also genetically controlled, just as your ABO factors are, and two of the systems that were analyzed in

this particular case are the PGM system, and PGM stands for phosphoglucomutase, and the other system is haptoglobin. Within the PGM system you can be basically one of three types: you can be PGM 1, PGM 2, or PGM 2-1. Within the haptoglobin system [Hp], you can be basically one of three types, Haptoglobin 1, Haptoglobin 2, or Haptoglobin 2-1."

Over objection, this witness was then permitted to say: "The combination of these blood groups occurs in approximately 11% of the United States' population." Defendant assigns admission of this statement as error, contends it has no relevancy and that the only effect of allowing the 11% figure into evidence "was to incite prejudice in the minds of the jury." Defendant argues that a city the size of Winston-Salem would contain thousands of persons with the same blood type as the victim in this case, and the challenged evidence could only mislead the jury into believing that the particular blood type allegedly found on defendant's shoes came from an extremely limited source when in fact the source actually encompassed a very large number of people. We see no error here.

Justice Exum, speaking for the Court in *State v. Gray*, 292 N.C. 270, 233 S.E. 2d 905 (1977), said: "We believe the better view to be that the results of blood grouping tests are generally admissible. While their positive probative value is somewhat tenuous, we see little, if any, ascertainable prejudice which could arise from their admission. As we observed in *State v. Johnson* [280 N.C. 281, 185 S.E. 2d 698 (1972)]: 'At most, analysis of hair and blood samples tended to identify the defendant as belonging to the class to which the guilty party belonged. The analysis might have indicated he did not belong to that class.' Obviously the tests are highly probative negatively." So it is here. Had the blood grouping test shown that the blood on defendant's tennis shoes did not belong to the same group as Mr. Agha's blood, this would have been highly significant in defendant's favor and would tend to exonerate him. On the other hand, since the blood test showed that the victim's blood group was the same as the blood on defendant's shoes, the test was relevant but *weakly* probative in character because 11% of the population has the same blood type as Mr. Agha. In a city the size of Winston-Salem, this 11% would encompass several thousand people whose blood could have been on defendant's shoes. The challenged statement is therefore

mildy unfavorable to defendant but essentially harmless because its probative value is so minute. Certainly no prejudice resulted. Exclusion of the challenged testimony would not have changed the result of the trial. This assignment is overruled.

[4] Finally, defendant contends the court erred in allowing testimony concerning the blood tests because a proper chain of custody showing continuous possession of defendant's tennis shoes was not established. Thus, defendant says, the integrity of the blood test evidence was destroyed. This constitutes his third and final assignment of error.

The record shows that S.B.I. Agent Layton on 20 February 1979 received defendant's tennis shoes through the mails from Officer Everhart for footprint comparisons. Agent Layton kept the shoes in his control, custody and possession while they were in the S.B.I. laboratory and until they were returned to Officer Everhart by mail on 21 February 1979.

On 10 April 1979, S.B.I. Agent Laura J. Ward received by mail from Officer Everhart defendant's tennis shoes for analysis as to blood stains on them. Agent Ward testified: "I did keep that package and those shoes in my custody and control and possession while doing the examination and until I mailed them back to Officer Everhart."

Defendant asserts two prejudicial breaks in the chain of custody during the time Agent Layton had possession of the shoes. Defendant first argues that after Agent Layton received the shoes in the mail on 20 February 1979, he left them unattended for an hour in his unlocked private office. Agent Layton did not remain continuously in his office during that hour. Secondly, defendant asserts that someone other than Agent Layton carried the package to a mail pickup point after Layton had examined the shoes and made the footprint comparisons.

There is no merit in defendant's final assignment of error. The possibility that defendant's tennis shoes (State's Exhibit 11) could have been stolen, or other shoes substituted for them, while S.B.I. Agent Layton's private office was temporarily unlocked or while the shoes were carried to a mail pickup point by some employee of the S.B.I. laboratory other than Agent Layton, is too remote to break the chain of custody and too tenuous to render

the blood test evidence incompetent. Compare *State v. Hunt*, 297 N.C. 258, 254 S.E. 2d 591 (1979). We think the evidence supports the conclusion that the chain of custody of State's Exhibit 11 was unbroken. Immediately upon receiving the shoes on 20 February 1979, Agent Layton marked them with his initials, the date of receipt, and S.B.I. file number. Within an hour after receiving the shoes he examined them and then placed them in a locked file cabinet until he got ready to dictate the case. The shoes were repackaged and mailed to Officer Everhart the next day. Agent Layton testified without reservation that the markings on the shoes were his and that the shoes marked State's Exhibit 11 were the same shoes he had received and the same shoes he had sent out. There is no evidence that the shoes, at any time, had been tampered with. Accordingly, defendant's third assignment of error is overruled.

Defendant received a fair trial free from prejudicial error. The judgments appealed from must therefore be upheld.

No error.