STATE OF NORTH CAROLINA v. BILLY JOE PEARSON

No. 8718SC811

(Filed 19 April 1988)

1. **Homicide § 21.2; Robbery § 4.3— armed robbery—second degree murder—sufficiency of evidence**

    Evidence was sufficient to support defendant's convictions of armed robbery and second degree murder where it tended to show that prior to the incident, defendant purchased a .45 caliber gun and ammunition consistent with that used to kill the victim; the day before the murder, defendant obtained instruction in the use of a .45 handgun; someone other than the victim was bleeding at the scene; on the night of the murder, defendant suffered a serious gunshot wound for which he delayed seeking treatment and for which he gave three false and contradictory explanations; the following day he sought assistance in disposing of a bag containing money in denominations consistent with that missing from the victim's pool hall, including a large quantity of rolled change; bloodstains on the victim's clothing matched the relatively rare blood type of defendant; defendant's wound was saturated with gunpowder while there was no gunpowder on the victim's wound or clothing; and the angle of the fatal bullet suggested it was fired from close range.

2. **Criminal Law § 55.1— defendant's blood type—evidence admissible as proof of identity**

    In a prosecution for murder and robbery evidence of defendant's blood type was properly admitted and could be used, along with other circumstances, as some proof of identity.

3. **Constitutional Law § 40— collection of hair, fingernail and blood samples without attorney present—right to counsel not violated**

    There was no merit to defendant's contention that his right to counsel was violated by the collection of blood, hair and fingerprint samples without an attorney present, since defendant was present and represented by counsel at a prior hearing regarding the issuance of the nontestimonial identification order, and defendant failed to demonstrate how his rights would have been further protected by the actual presence of counsel during the taking of the evidence sample.

4. **Criminal Law § 84; Searches and Seizures § 4— withdrawal of blood sample without warrant—violation of defendant's rights—good faith exception to exclusionary rule**

    Although the withdrawal of a blood sample without a warrant from a defendant in custody violated defendant's Fourth Amendment right to be free from unreasonable searches and seizures, the trial court could properly admit the blood sample into evidence under the good faith exception to the exclusionary rule where an officer applied in good faith to a district court judge who conducted a hearing and issued a nontestimonial identification order; *State v. Welch*, 316 N.C. 578 (1986), had not been decided at that time; and the

officer thus took every reasonable step, based on the existing law, to comport with Fourth Amendment requirements.

APPEAL by defendant from *William H. Helms, Judge.* Judgments entered 29 October 1986 in Superior Court, GUILFORD County. Heard in the Court of Appeals 1 February 1988.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Doris J. Holton, for the State.*

*Mary K. Nicholson for defendant-appellant.*

BECTON, Judge.

Defendant, Billy Joe Pearson, was convicted by a jury of robbery with a dangerous weapon and second degree murder. The court imposed a sentence of imprisonment for thirty-five years for the second degree murder conviction and the presumptive sentence of fourteen years for robbery with a firearm.

On appeal to this Court, defendant brings forward sixty assignments of error, forty-five relating to the admission of various real and testimonial evidence, three relating to discovery matters, one relating to the joinder of the two offenses for trial, four relating to arguments by the district attorney to the jury, four relating to the jury instructions, two relating to the denial of defendant's motions to dismiss and to set aside the verdict for insufficiency of the evidence, and one relating to the trial judge's findings of aggravating and mitigating factors at the sentencing phase of the proceedings. Of these assignments of error, the only issues which merit discussion are (1) the sufficiency of the evidence to support the convictions, and (2) the propriety of the admission of certain evidence obtained by way of a "nontestimonial identification order" issued pursuant to N.C. Gen. Stat. Sec. 15A-271 to -282 (1983). Having carefully considered all of the arguments presented, we conclude that defendant's trial and sentencing were free of error.

I

We first consider the contention of defendant that there was insufficient evidence to support his convictions of armed robbery and second degree murder.

A

At trial, the evidence presented by the State tended to show the following:

The body of Lawrence Elsasser was discovered by a city employee about 7:00 a.m. on 26 March 1985 beside a dumpster located behind Elsasser's place of business, the On-Cue Pool Hall, in Greensboro. According to expert witnesses, Elsasser died at approximately 2:00 a.m. from a gunshot wound caused by either hand-loaded or commercially reloaded .45 caliber ammunition fired from either a Llama or Star pistol, or from an Eagle Arms rifle or carbine. The angle of the bullet, which entered the collarbone, travelled down through the lungs, and lodged in the spine, showed that the fatal shot was fired from above and to the left of the body. The victim was paralyzed instantly and died within three or four minutes. An absence of powder burns or residue on the victim's body or clothing indicated either that the shot was fired from a distance or from within several inches to two feet with some object between the gun barrel and the body acting as a shield to absorb the residue. The victim's shirt and jacket were soaked with blood but contained no bullet holes.

The victim's keys were discovered a few feet from the pool hall's double front doors, which were unlocked and partially ajar. There were unidentified blood smears on the door frame, door handle, and push bar. The victim apparently was shot about fifteen feet from the front door where there was a large pool of blood and, in the same vicinity, a spent .45 caliber shell casing and some miscellaneous items which evidently were from the victim's pockets. Drag marks led around the corner of the building to a second pool of blood. The victim's wallet lay nearby; it contained no cash and its other contents appeared undisturbed. The drag marks continued from that point to where the body lay. The victim's pockets were turned inside out. Some coins and a pocketknife were discovered near the body.

Robert Green, co-owner of the On-Cue, testified that the interior of the building appeared as it normally did when the business had been closed for the night. A .38 special handgun kept on the premises was missing, as well as approximately $2,200.00 to

$2,300.00 in currency and in rolled quarters, dimes, and nickels from video machines.

Elsasser took over the evening shift at the On-Cue at 7:00 p.m. on 25 March. His girlfriend, Julie Elmore, took him to work and his jeans had no blood on them at that time. The poolroom ordinarily closed at 1:00 a.m. or, if customers were present, at 1:30 a.m. Elsasser called his girlfriend about 12:30 a.m. and told her he was cleaning up and would be home soon. Eric Greeson, a frequent patron, was at the On-Cue with a friend until around 1:45 a.m. When they left, Elsasser was closing up and no one else was there.

Joyce Allen, manager of a convenience store near the poolroom, was at work when, between 2:15 and 2:30 a.m. on 26 March she heard a loud banging sound.

Defendant, who lived near the On-Cue and was a frequent patron of the establishment, was seen at the L. Richardson Hospital emergency room at approximately 11:00 a.m. on 26 March 1985 for treatment of a serious gunshot wound to his left hand. The bullet entered at an angle through the palm and exited through the back of the third finger, causing the third joint to be completely "blown out" and require surgical replacement. The wound, which was not more than 24 hours old, was still bleeding, was saturated with gunpowder and, according to expert medical testimony, should have been very painful. Defendant told the doctor the injury occurred while he was cleaning a gun around 7:00 the previous evening, but he gave no explanation for having waited to seek treatment.

That afternoon, defendant told investigating officers at the hospital that he was wounded at approximately 7:30 p.m. on 25 March when his friend T. C. Stroke was showing him how to jam Stroke's .38 caliber handgun at the South Gate Inn where Stroke was staying. He also stated that he and Stroke had been in the On-Cue for a few minutes earlier that evening. However, Stroke testified that he saw defendant at the South Gate Inn about 2:30 on the afternoon of 25 March. Defendant showed him a .45 caliber pistol and told him he did not know how to operate it very well. Stroke instructed him in its operation and defendant left. The gun was not fired in Stroke's presence, nor did Stroke see defendant any more that day or night.

Anthony Ray Upchurch, a customer at the On-Cue from 7:00 p.m. to 1:30 a.m. the night of the murder, saw defendant there shooting pool between 8:00 and 9:00 p.m., and defendant's hand was not injured at that time. On 29 March 1985, the day defendant was taken into custody, he stated to police that he was shot during a scuffle with an assailant at about 11:00 p.m. on 25 March outside the South Gate Inn where he had gone to see a friend.

The State presented additional evidence that sometime prior to the murder, defendant traveled to Alabama and there, accompanied by his housemate, Terry Bracken, purchased a .45 caliber Llama pistol and commercially reloaded ammunition from a pawnshop. Sometime after they returned and before the murder, defendant's other housemate, Lloyd Parker, saw defendant show what he thought was a .45 to some friends and heard defendant say the gun was his. Defendant denied to the investigating officers having ever owned a handgun.

Neither of his roommates saw defendant at home the night of the murder. Kesha Nash, Bracken's girlfriend, heard the voice of defendant at Bracken's bedroom door around midnight but she never saw him. Defendant called Stephanie Donnell that night about midnight and talked until approximately 1:30 a.m. Ms. Donnell encountered defendant the following morning about 8:00. She noticed his injured hand, encouraged him to go to the hospital because he complained of pain, and, when he finally agreed, drove him there around 11:00 a.m. Defendant told Ms. Donnell he was injured while some guy was showing him a trick with a gun.

On 26 March, defendant called his housemate, Bracken, from the hospital and asked him to "get rid" of a brown bag and a pool stick in a black case located in defendant's closet and also to bring some things he needed to the hospital. At the hospital, defendant asked Bracken if he got rid of the bag, but defendant did not want to talk further because there "might be bugs in the room." After leaving the hospital Bracken felt inside the brown duffel bag and discovered rolls of coins contained in a smaller bag and also some currency in rubber bands. Bracken left the bag and pool stick at the home of a friend, Robin Baines, with instructions not to touch it. Ms. Baines estimated that there was about $120.00 in coins and $1,200.00 in currency in the bags. She and Bracken spent the money over a period of time.

Bracken visited defendant in jail following his arrest and asked him what really happened. Defendant responded, "I had to do what I had to do," but declined to talk further for fear of being overheard.

The pools of blood at the crime scene and most of the blood on the victim's clothing matched that of the victim. Four stains on the victim's jeans, three of which were located near the pockets, were identified as being of a blood type inconsistent with that of the victim but which matched the blood type of defendant, a blood type possessed by only .5% of the black population and .8% of the white population. Hair fragments found on the victim's shirt and shoes were identified as having originated from a black person. Defendant is black and the victim was white.

Defendant offered no evidence.

B

[1] In considering a motion to dismiss for insufficiency of the evidence, the court must determine whether there is substantial evidence of each element of the offense charged and that the defendant is the perpetrator. *E.g., State v. Rasor*, 319 N.C. 577, 356 S.E. 2d 328 (1987). The evidence must be considered in the light most favorable to the State; all contradictions and discrepancies must be resolved in the State's favor; and the State must be given the benefit of every reasonable inference to be drawn from the evidence. *E.g., State v. Blake*, 319 N.C. 599, 356 S.E. 2d 352 (1987). This test of the sufficiency of the evidence is the same whether the evidence is direct, circumstantial, or both. *E.g., State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). Moreover, the evidence favorable to the State must be considered as a whole to judge its sufficiency, especially when the evidence is circumstantial, since one piece of such evidence will rarely point to a defendant's guilt. *Id.*

Second degree murder is the unlawful killing of another human being with malice but without premeditation and deliberation. *E.g., State v. Brown*, 300 N.C. 731, 268 S.E. 2d 201 (1980). Armed robbery is the taking of personal property from the person or presence of another, by the use or threatened use of a dangerous weapon, whereby the victim's life is endangered or threatened. N.C. Gen. Stat. Sec. 14-87(a) (1986); *Rasor*. Defendant

maintains his murder conviction cannot be upheld because there is no proof the gun purchased in Alabama was the murder weapon and because there is no direct evidence linking him to the crime. He further argues that there is inadequate evidence that a robbery occurred or, if it did, that defendant was the perpetrator or even that the perpetrator of the murder was also the robber. We disagree.

The evidence, viewed in the light most favorable to the State, showed that prior to the incident, defendant purchased a .45 caliber gun and ammunition consistent with that used to kill the victim; that the day before the murder, defendant obtained instruction in the use of a .45 handgun; that someone other than the victim was bleeding at the scene; that, on the night of the murder, defendant suffered a serious gunshot wound for which he delayed seeking treatment and for which he gave three false and contradictory explanations; that the following day, he sought assistance in disposing of a bag containing money in denominations consistent with that missing from the pool hall, including a large quantity of rolled change; and that bloodstains on the victim's clothing matched the relatively rare blood type of defendant. Moreover, defendant's wound was saturated with gunpowder while there was no gunpowder on the victim's wound or clothing, and the angle of the fatal bullet suggested it was fired from close range.

Taken as a whole, this and other evidence presented by the State supports a reasonable inference that defendant was the perpetrator of the crime, that the gun purchased in Alabama was the murder weapon, and that defendant's own wound was self-inflicted when he shot the victim. Further, when considered along with physical evidence at the scene, such as the victim's empty pockets, this evidence is also sufficient to allow the jury to reasonably find that the murder was committed by defendant in furtherance of a robbery of the victim and his place of business. Accordingly, we hold that the evidence supports both of defendant's convictions and that the trial court properly denied defendant's motions to dismiss and to set aside the verdict.

## II

We next address defendant's contention that certain evidence, obtained pursuant to a nontestimonial identification order,

was erroneously admitted at trial. Defendant was first arrested on 29 March 1985 on a misdemeanor charge of giving a false report to the police regarding the origin of his gunshot wound. On that date and while defendant was in custody, the State sought and obtained issuance of a nontestimonial identification order permitting the collection of blood, hair, and fingerprint samples. The samples were obtained that day, the seventy-two hour notice requirement set forth in N.C. Gen. Stat. Sec. 15A-274 having been waived based on evidence that defendant had stated an intention to go to California immediately and that his bags were packed.

Defendant timely moved to suppress the evidence, contending that (1) the "minimum positive probative value" of evidence of defendant's blood type was outweighed by its prejudicial impact; (2) the evidence was collected in violation of statutory requirements governing nontestimonial identification orders, specifically the provisions requiring a seventy-two hour notice and a return within ninety days, N.C. Gen. Stat. Secs. 15A-274 and -280; and (3) the blood sample was withdrawn without a warrant or probable cause, resulting in an unlawful search and seizure, and was also taken without counsel present in violation of his constitutional right to counsel. Following a *voir dire*, the motion was denied and defendant now presents the same arguments on appeal. Our discussion is confined to the propriety of the admission of evidence of defendant's blood type, since the hair samples and fingerprints were not determined to match any found at the scene and their acquisition thus did not prejudice defendant.

A

[2]   We summarily reject the first argument that the evidence of defendant's blood type was so irrelevant as to be inadmissible. Although such evidence standing alone is inadequate to positively identify a particular individual as the source of a bloodstain or as the perpetrator of a crime, *see, e.g., State v. Bell*, 65 N.C. App. 234, 309 S.E. 2d 465 (1983), *affirmed*, 311 N.C. 299, 316 S.E. 2d 72 (1984) *(per curiam)*, it is nevertheless generally of sufficient probative value to be properly admitted and may be used, along with other circumstances, as some proof of identity. *See, e.g., State v. Fulton*, 299 N.C. 491, 263 S.E. 2d 608 (1980); *State v. Gray*, 292 N.C. 270, 233 S.E. 2d 905 (1977).

B

[3] We also summarily reject the contention that defendant's right to counsel was violated by the collection of the evidence sample without an attorney present. Assuming *arguendo* that a suspect is constitutionally entitled to the presence of counsel during such proceedings, we nevertheless find no prejudicial treatment of defendant in this case. The record shows that defendant was present and represented by counsel at a prior hearing regarding the issuance of the nontestimonial identification order, and defendant has failed to demonstrate how his rights would have been further protected by the actual presence of counsel during the taking of the evidence sample.

C

[4] The remaining issues relating to the blood evidence are controlled by our Supreme Court's decision in *State v. Welch*, 316 N.C. 578, 342 S.E. 2d 789 (1986). Like the *Welch* Court, we deem it unnecessary to address the arguments raised concerning possible technical violations of the statutes governing the issuance of nontestimonial identification orders since defendant was not entitled to the protections of such an order while in custody. *See id.* at 585, 342 S.E. 2d at 792-93. *See also State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977); *State v. Puckett*, 46 N.C. App. 719, 266 S.E. 2d 48, *appeal dismissed*, 300 N.C. 561, 270 S.E. 2d 115 (1980).

In *Welch*, the Court held, citing *Schmerber v. California*, 384 U.S. 757, 16 L.Ed. 2d 908 (1966), that "[t]he withdrawal of a blood sample from a person is a search subject to fourth amendment protection" and that, consequently, "a search warrant must be procured before a suspect may be required to submit to such a procedure unless probable cause and exigent circumstances exist that would justify a warrantless search." *Welch* at 585, 342 S.E. 2d at 793. The Court concluded that the defendant's rights had been violated in that case by the withdrawal of a blood sample without a warrant or justification for a warrantless search, but nevertheless upheld the admission of the evidence obtained pursuant to a nontestimonial identification order, by applying the "good faith" exception to the exclusionary rule established by the Supreme Court in *United States v. Leon*, 468 U.S. 897, 82 L.Ed. 2d 677 (1984). *See also State v. Fisher*, 321 N.C. 19, 361 S.E. 2d 551 (1987).

State v. Pearson

Applying the same analysis utilized in *Welch* to the present case, we conclude that the trial court was not required to exclude the sample of defendant's blood. As in *Welch*, the withdrawal of a blood sample without a warrant in this case resulted in a violation of defendant's fourth amendment right to be free of unreasonable searches and seizures. However, the competent evidence presented on *voir dire* showed that the police officer responsible applied in good faith to a district court judge who conducted a hearing and issued a nontestimonial identification order based on evidence of facts establishing (1) probable cause to believe that an offense punishable by imprisonment for more than one year had been committed, (2) reasonable grounds to suspect defendant had committed the offense, and (3) the results would materially aid in determining whether defendant committed the offense. *See* N.C. Gen. Stat. Sec. 15A-273; *Welch* at 589, 342 S.E. 2d at 795. At that time, *Welch* had not been decided, and the officer thus took every reasonable step, based on the existing law, to comport with fourth amendment requirements. We therefore hold, based on the *Leon* "good faith" exception to the exclusionary rule, that the evidence resulting from the taking of a sample of defendant's blood was properly admitted.

## III

We have carefully reviewed each of defendant's remaining assignments of error and have found them to be without merit. Defendant received a fair trial free of reversible error.

No error.

Chief Judge HEDRICK and Judge SMITH concur.