IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-624

Filed 17 September 2025

Chowan County, Nos. 19CRS000293-200, 19CRS050233-200, 19CRS050234-200

STATE OF NORTH CAROLINA

v.

JOSEPH STEPHEN JETT, Defendant.

Appeal by defendant from judgments entered 13 January 2023 by Judge J. Carlton Cole in Chowan County Superior Court. Heard in the Court of Appeals 7 February 2024.

*Attorney General Jeff Jackson, by Assistant Attorney General Alesia Mikhaulauna Balshakova, for the State-appellee.*

*The Sweet Law Firm, PLLC, by Kaelyn N. Sweet, for defendant-appellant.*

GORE, Judge.

Defendant Joseph Stephen Jett was indicted for possession of firearm by felon, felony breaking and/or entering, felony larceny after breaking and/or entering, felony possession of stolen goods/property, and attaining the status of an habitual felon. All charges arose from conduct on 28 June 2017.

The matter came on for trial at the 11 January 2023 session of Chowan County superior court. The jury found defendant guilty of possession of a firearm by a felon, felony breaking and/or entering, and attaining habitual felon status. He was acquitted of the remaining charges.

The trial court entered two judgments. In 19CRS50234, defendant was sentenced to 110 to 144 months' imprisonment. In 19CRS50233, he was sentenced to 97 to 129 months' imprisonment, to run consecutively. Defendant received 44 days' credit for pretrial confinement. He gave oral notice of appeal in open court the same day.

Defendant presents four issues on appeal: (i) whether the guilty verdict for possession of a firearm by felon is inconsistent with the not guilty verdicts for felony larceny and felony possession of stolen goods; (ii) whether the trial court plainly erred by admitting a law enforcement officer's testimony regarding DNA evidence; (iii) whether the restitution order of $1,118 is supported by competent evidence; and (iv) whether the trial court erred by ordering payment of attorney's fees without first providing defendant notice and opportunity to be heard.

Upon review, we discern no error in the trial court's judgment.

**I.**

On 28 June 2017, Jeffery Roberts[1] locked the door to his modular home before leaving for a doctor's appointment. When he returned, he found the back door hanging by a single hinge and standing open. Inside, the home was in disarray, with cabinets open and belongings scattered about. Roberts soon discovered that two firearms were missing: a pump-action Harrington & Richardson shotgun and a

---

[1] A pseudonym.

shortened, chrome-plated shotgun with a black lacquer stock. No other property was taken.

Roberts contacted law enforcement, and officers arrived at his home. While they examined the scene, Roberts went to his Florida room and noticed a "brown-filter" cigarette butt freshly burned into his carpet. He informed officers it was not his, explaining that he smoked only "white-filter" cigarettes and kept ashtrays throughout the house. Roberts further stated that no one had smoked in his home for at least a week before the break-in.

Deputy Jeff Edwards of the Chowan County Sheriff's Office was the second officer to arrive after Roberts reported the break-in. Edwards spoke with Roberts' neighbor, Vincent Harris,[2] regarding a possible suspect description. Harris stated that while working in his shop behind his house with the garage door open, he looked toward Roberts's home and briefly observed a person standing at the back door. He described the individual as a white male of average build, wearing summer clothing and possibly a baseball cap. Harris stated he was not concerned at the time because he assumed the person might have been visiting Roberts.

Deputy Edwards examined the back door and observed damage consistent with the use of a prying tool, though no such tool was found at the scene. He obtained detailed descriptions of the two missing firearms: an operable Harrington &

---

[2] A pseudonym.

Richardson shotgun with a listed serial number, and a second shotgun described as decorative. Edwards also observed a cigarette butt on the floor near the sliding glass door at the rear of the home, which he collected and submitted to the North Carolina State Crime Lab for forensic testing. Based on his investigation, Edwards concluded that defendant had broken into Roberts's home.

At the time the cigarette butt was submitted, Sarah Ellis was employed as a Forensic Scientist III in the forensic biology section of the North Carolina State Crime Lab. She performed two analyses on the cigarette butt. The first yielded a DNA profile, which she determined was consistent with a mixture of two contributors, including at least one male. Ellis later received a buccal swab containing defendant's DNA and compared it to the profile obtained from the cigarette butt. She concluded that defendant's DNA profile could not be excluded as a contributor to the mixture.

Chief Deputy John McArthur became involved in the investigation on 2 April 2019, after the North Carolina State Crime Lab notified the Chowan County Sheriff's Office of a DNA "hit" on evidence previously submitted. He testified that the lab reported the DNA profile from the cigarette butt was consistent with defendant's DNA profile contained in the system. Based on this information, McArthur obtained probable cause and arrested defendant.

At trial, Roberts testified that he did not know defendant. He recalled that four or five years before the break-in, he permitted defendant's mother and several of her children to stay at his home for a few days because they were experiencing

difficulties. After three or four days, Roberts contacted the sheriff's department to have them removed. He was unable to recognize or identify defendant in the courtroom.

Defendant told Chief Deputy McArthur that in 2009 or 2010, he, his mother, brother, and two sisters stayed at Roberts's house after being forced to leave their father's home. Defendant also stated that on 28 June 2017, the date of the break-in, he was incarcerated. McArthur confirmed, however, that defendant was not in prison at that time. McArthur further testified that Harris's description of the individual seen at Roberts's door was consistent with defendant's appearance.

Roberts provided police with the serial number of the first shotgun, which was later recovered at Chauncey's Pawnshop in Elizabeth City. The second shotgun, a relic from the 1960s dating to Roberts's employment with the Portsmouth Police Department, was never recovered. Chief Deputy McArthur testified that, based on his investigation, defendant did not personally pawn the Harrington & Richardson shotgun but was connected to the individual who did.

Lisa Smith, Assistant Clerk of superior court for Chowan County, testified that defendant's record included the following convictions: felony breaking and/or entering on 28 February 2011; felony possession with intent to sell and deliver a Schedule I controlled substance and maintaining a vehicle or dwelling for controlled substances on 17 June 2015; and felony larceny on 7 June 2016.

Roberts testified that he suffered financial loss as a result of the break-in.

Unable to afford replacement, he attempted to repair the damaged carpet himself. The State introduced receipts showing $266.89 for replacement of Roberts's door, though Roberts estimated the total cost of installing a new door, seal, trim, and lock at approximately $1,200 to $1,400.

With respect to the value of the second, unrecovered decorative shotgun, Roberts testified:

> Sentimental value and everything like that, it's unbelievable. I mean, I got a lot of labor and stuff into it getting it chrome-plated and black-lacquered stock and that type of stuff, 2 or $3,000 probably it would bring at a swap meet or something like that.

At the close of the State's evidence, defendant moved to dismiss. He presented no evidence and renewed the motion, which the trial court denied. The court instructed the jury on five substantive offenses: felonious breaking and entering, felonious larceny, possession of stolen property, felonious larceny of a firearm, and possession of a firearm by a felon.

The jury found defendant guilty of felonious breaking and entering and possession of a firearm by a felon, and not guilty of felonious larceny and possession of stolen goods. In a subsequent phase, the jury determined that defendant had attained habitual felon status. At sentencing, the State requested restitution in the amount of $1,118.

## II.

**A.**

We first consider whether the trial court erred by accepting allegedly inconsistent verdicts. Defendant argues that the guilty verdict for possession of a firearm by a felon is mutually exclusive with the not guilty verdicts for felony larceny and felony possession of stolen goods. He contends the jury necessarily found he possessed a Harrington & Richardson single-shot shotgun for purposes of the possession charge, while simultaneously finding he did not possess the same firearm for purposes of larceny and possession of stolen goods.

Defendant did not preserve this issue for appellate review, and his argument is without merit.

Defendant concedes he did not raise any alleged inconsistency in the verdicts at trial and did not object to the trial court's entry of judgment on the guilty verdict. He has therefore failed to preserve this issue for appellate review. *See* N.C.R. App. P. 10(a)(1). Defendant nevertheless asks this Court to invoke Rule 2 of the North Carolina Rules of Appellate Procedure to reach the merits. "Rule 2 specifically gives either court of the appellate division the discretion to suspend or vary the requirements or provisions of any of the rules in order to prevent manifest injustice to a party, or to expedite decision in the public interest." *State v. Hart*, 361 N.C. 309, 315 (2007) (cleaned up) (quoting N.C.R. App. P. 2).

The State contends this issue should be reviewed for plain error. We disagree. "Plain error analysis applies to evidentiary matters and jury instructions[,]" *State v. Garcell*, 363 N.C. 10, 35 (2009), and may be raised on appeal "when the judicial action

questioned is specifically and distinctly contended to amount to plain error[,]" N.C.R. App. P. 10(a)(4). Defendant neither alleges plain error nor presents this issue as involving evidence or jury instructions. *Id.*

Thus, we must determine whether this Court should invoke Rule 2 to reach the merits of defendant's argument on appeal. As our Supreme Court has repeatedly stated:

> Rule 2 relates to the residual power of our appellate courts to consider, *in exceptional circumstances*, significant issues of importance in the public interest or to prevent injustice which appears manifest to the Court *and only in such instances*. This assessment—whether a particular case is one of the rare instances appropriate for Rule 2 review— must necessarily be made in light of the *specific circumstances of individual cases and parties*, such as whether substantial rights of an appellant are affected. In simple terms, precedent cannot create an automatic right to review via Rule 2. Instead, whether an appellant has demonstrated that his matter is the rare case meriting suspension of our appellate rules is always a discretionary determination to be made on a case-by-case basis.

*State v. Campbell*, 369 N.C. 599, 603 (2017) (cleaned up).

Defendant relies on *State v. Hames*, 170 N.C. App. 312, 321 (2005), where this Court invoked Rule 2 to review legally contradictory verdicts because the defendant's arguments were "persuasive" under the circumstances of that case. Here, defendant contends he "was sentenced to a minimum of nine years imprisonment on the basis of what appears to be legally contradictory and mutually exclusive verdicts, warranting invocation of Rule 2 to prevent manifest injustice."

However, defendant cannot rely on precedent alone to justify Rule 2 review. *Campbell*, 369 N.C. at 603. Nor has he shown that this case presents the type of rare or exceptional circumstances that would warrant suspension of our appellate rules. *State v. Gayton-Barbosa*, 197 N.C. App. 129, 135 (2009). "In the absence of any argument specific to the facts of this case, . . . [defendant] is no different from countless other defendants whose . . . arguments were barred on direct appeal because they were not preserved for appellate review." *State v. Bishop*, 255 N.C. App. 767, 769–70 (2017).

In considering whether to invoke Rule 2, we have independently reviewed defendant's argument and conclude it lacks merit. *See State v. Draughon*, 281 N.C. App. 573, 586 (2022) (addressing the merits of a claim of "legally inconsistent and mutually exclusive verdicts" to determine whether Rule 2 review was warranted).

"In North Carolina jurisprudence, a distinction is drawn between verdicts that are merely inconsistent and those which are legally inconsistent *and* contradictory." *State v. Mumford*, 364 N.C. 394, 398 (2010) (citation omitted). "Verdicts are inconsistent when they reflect some logical flaw or compromise in the jury's reasoning." *State v. Watson*, 277 N.C. App. 314, 324 (2021). "[W]hen there is sufficient evidence to support a verdict, mere inconsistency will not invalidate the verdict." *Mumford*, 364 N.C. at 398 (citation and quotation marks omitted). On the other hand, verdicts are *legally* contradictory (i.e., mutually exclusive) and subject to reversal, "when a verdict purports to establish that the defendant is guilty of two

separate and distinct criminal offenses, the nature of which is such that guilt of one necessarily excludes guilt of the other." *Id.* at 400 (cleaned up).

The jury found defendant guilty of possession of a firearm by a felon, felonious breaking or entering, and attaining habitual felon status. It found him not guilty of felony larceny and felony possession of stolen goods. Defendant contends these verdicts "were legally contradictory and mutually exclusive" because, in his view, he "was simultaneously found to have possessed and also to not have possessed the exact same H&R shotgun." In support, he cites *State v. Hames*, 170 N.C. App. 312 (2005); *State v. Yang*, 174 N.C. App. 755 (2005); and *State v. Hall*, 104 N.C. App. 375 (1991). These cases, however, are distinguishable, and defendant's reliance on them is misplaced.

First, *Hames*, *Yang*, and *Hall* each involved claims of logically inconsistent guilty verdicts. *See Hames*, 170 N.C. App. at 322–23; *Yang*, 174 N.C. App. at 761–62; *Hall*, 104 N.C. App. at 386. Here, by contrast, defendant challenges the consistency of one guilty verdict with two not guilty verdicts.

Second, defendant suggests the jury was required to reach uniform verdicts on all charges because each offense turned on the element of possession. But possession was only one element the jury had to consider in determining guilt of possession of a firearm by a felon, felony larceny, or felony possession of stolen goods. It is well established that "[i]f two statutes are violated even by a single act and each offense requires proof of an additional fact which the other does not, an acquittal or conviction

under either statute does not exempt the defendant from prosecution and punishment under the other." *State v. Brake*, 279 N.C. App. 416, 422 (2021) (quotation marks omitted) (quoting *State v. Birckhead*, 256 N.C. 494, 500 (1962)). Thus, the verdicts here "are not mutually exclusive because guilt of one criminal act does not exclude guilt of the other." *Brake*, 279 N.C. App. at 425. Each of the charged offenses has distinct elements, and "jury verdicts may be influenced by many factors." *Id.* at 424 (citing *Mumford*, 364 N.C. at 399).

Finally, it is unclear what evidence supports defendant's theory that the jury's verdicts were logically contradictory based solely on a single element. A jury's "verdict may have been the result of compromise, or of a mistake on the part of the jury, . . . [b]ut verdicts cannot be upset by speculation or inquiry into such matters." *Mumford*, 364 N.C. at 399. Moreover, "if the inconsistent verdicts are determined to be merely inconsistent, rather than mutually exclusive, then the verdicts will stand so long as the State has presented substantial evidence as to each element of the charges." *State v. Blackmon*, 208 N.C. App. 397, 403 (2010) (citing *Mumford*, 364 N.C. at 398).

In sum, defendant did not preserve his claim of inconsistent verdicts for appellate review. Having independently considered the argument, we conclude it lacks merit. We therefore decline to invoke Rule 2, and discern no error.

**B.**

Defendant next contends the trial court plainly erred by permitting Chief

Deputy John McArthur to give improper lay opinion testimony that "the DNA on the cigarette butt matched the DNA belonging to [defendant]," whereas the State's qualified forensic expert, Sarah Ellis, testified only that defendant "could not be excluded as a contributor to the mixture." Defendant argues Ellis, as the State's qualified expert, had already presented the relevant scientific evidence, and McArthur was in no better position than the jury to interpret it.

Upon review, we conclude defendant mischaracterizes McArthur's testimony and, in part, invited the error of which he now complains. Moreover, even assuming *arguendo* that portions of McArthur's testimony were erroneously admitted, defendant has not shown prejudice. We therefore discern no plain error.

Defendant concedes he did not object to Chief Deputy McArthur's testimony at trial. On appeal, he contends the admission of McArthur's lay opinion testimony constitutes plain error. N.C.R. App. P. 10(a)(4). "For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Lawrence*, 365 N.C. 506, 518 (2012) (citing *State v. Odom*, 307 N.C. 655, 660 (1983)). "To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *Id.* (quotation marks and citations omitted). Because plain error review is applied "cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (cleaned up).

"It is the province of the jury to decide what inferences and conclusions are warranted by the testimony." *State v. Peterson*, 225 N.C. 540, 543 (1945), *overruled on other grounds by State v. Hill*, 236 N.C. 704 (1953). Lay witness testimony is generally inadmissible "because it tends to invade the province of the jury." *State v. Fulton*, 299 N.C. 491, 494 (1980). Under our Rules of Evidence:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (2023). "The essential question in determining the admissibility of opinion evidence is whether the witness, through study and experience, has acquired such skill that he is better qualified than the jury to form an opinion as to the subject matter to which his testimony applies." *Fulton*, 299 N.C. at 494 (quotation marks and citation omitted). Relatedly, "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." § 8C-1, Rule 704 (2023).

The State's forensic biology expert, Sarah Ellis, testified that she conducted several analyses of the cigarette butt recovered from the victim's residence. The first test produced a DNA profile, which she described as "consistent with a mixture of two contributors." After receiving a buccal swab from defendant, Ellis compared defendant's DNA with the profile obtained from the cigarette butt. In her expert

opinion, "the DNA profile obtained from [defendant] could not be excluded as a contributor to the mixture." When asked to clarify whether she observed similarities between defendant's DNA profile and the cigarette butt profile, Ellis reiterated that she could not exclude defendant as a contributor.

Chief Deputy McArthur testified immediately following the State's forensic expert, and the State elicited the following testimony on direct examination, without objection by defense counsel:

> [PROSECUTOR]: Were you involved in the breaking and entering investigation regarding [the victim's] house?
>
> [MCARTHUR]: I was. Not initially at the time of the report, but I got it some time later.
>
> [PROSECUTOR]: And . . . [w]hen did you first get involved?
>
> [MCARTHUR]: I first got involved on [2 April 2019]. The sheriff's office received notification from the State Bureau of Investigation Crime Lab about a CODIS hit, a DNA hit, on a piece of — on an item of evidence that we submitted to their lab. That item of evidence was tested for DNA, and they were able to determine an individual that possessed that DNA.
>
> [PROSECUTOR]: And that item that you said you submitted, what was that item?
>
> [MCARTHUR]: That was the cigarette butt.
>
> [PROSECUTOR]: Is that the cigarette butt we were talking about yesterday from [the victim's] house?
>
> [MCARTHUR]: The cigarette butt hat had been recovered from his carpet by the Florida room door.

[PROSECUTOR]: And who, if anyone, did the State Crime Lab indicate would have a similar DNA?

[MCARTHUR]: Joseph Stephen Jett [(defendant)].

[PROSECUTOR]: So once you received that information from the State Crime Lab, what did you do?

[MCARTHUR]: Per their protocol, there has to be — so they had a DNA sample to compare to the DNA that was on the cigarette butt, but for checks and balances, basically, they require every new case to submit a buccal swap from the suspect that we — that is indicated based on the DNA hit, so that is what I did. I went and I located the whereabouts of [defendant], and I went to where he was, and I tried to get his buccal swab DNA.

[PROSECUTOR]: Were you able to meet with the defendant?

[MCARTHUR]: I was able to meet with the defendant, yes.

[PROSECUTOR]: And when you met with the defendant, did you advise him of his rights?

[MCARTHUR]: Yes, ma'am. . . . I read [defendant] his rights and had him sign his Miranda waiver so I knew he understood what those rights were.

[PROSECUTOR]: And by signing that waiver, he acknowledged his rights. Did he also agree to speak with you?

[MCARTHUR]: Yes, ma'am.

. . .

[PROSECUTOR]: When you asked specifically about the cigarette, what did the defendant say?

[MCARTHUR]: [He] [s]aid that there was no way that his DNA could be on the cigarette butt that we recovered, and I said, well, why would he feel that way? If the DNA is

there, it's there.  And he said, well, he wouldn't be that dumb to leave something like that behind.

. . .

[PROSECUTOR]:  You stated that you went to meet with the defendant to ultimately get a buccal swab.  Were you able to get that buccal swab?

[MCARTHUR]:  Yes, ma'am.

[PROSECUTOR]:  And what did you do with that buccal swab once you obtained it?

[MCARTHUR]:  I packaged it in a[n] . . . evidence bag, and I submitted that to the State Bureau of Investigation Crime Lab for them to compare to the standard and the DNA swab — I'm sorry — the DNA that they were able to recover off the cigarette butt.

. . .

[PROSECUTOR]:  And you stated you sent the buccal swab off to the State Crime Lab, correct?

[MCARTHUR]:  Yes, ma'am.

[PROSECUTOR]:  Did you receive results back where the State Crime Lab compared the buccal swab to the DNA from the cigarette?

[MCARTHUR]:  I did.

[PROSECUTOR]:  And just so we don't have to go into that detail again, was that all explained by Ms. Ellis yesterday?

[MCARTHUR]:  Yes.

. . .

[PROSECUTOR]:  Chief Deputy, did you continue your investigation after you received those items back from the State Crime Lab?

[MCARTHUR]: Yes, I did.

[PROSECUTOR]: And what, if anything, did you do next?

[MCARTHUR]: Once I received those items back and the report from the crime lab saying that the swabbing that I did matched the DNA that was on the cigarette butt that was found at [the victim's] house, I, in that moment, had probable cause to believe that [defendant] was the one that broke into that house and that he stole the items within, and then therefore he was in possession of the firearm as a convicted felon, and I presented that information to the District Attorney's Office and charges were brought.

Defendant asserts "the State offered Deputy Chief McArthur to provide his own lay opinion regarding the link between the DNA profiles."

> However, it is apparent from the context of [Chief Deputy McArthur's] testimony on direct examination that he was simply explaining the steps he took in furtherance of his ongoing investigation. His statements . . . served merely to provide context and explain his rationale for continuing to subject [d]efendant to additional scrutiny.
>
> Such testimony does not run afoul of Rule 701. Indeed, we have expressly held that testimony elicited to assist the jury in understanding a law enforcement officer's investigative process is admissible under Rule 701.

*State v. Daughtridge*, 248 N.C. App. 707, 716 (2016) (cleaned up). Defendant correctly observes that the jury was entitled to determine whether an "inability to exclude" carried the same weight as a direct DNA match. *See State v. White*, 154 N.C. App. 598, 605 (2002) ("The jury is charged with drawing its own conclusions from the evidence, and without being influenced by the conclusion of [a law enforcement officer].").  However, Chief Deputy McArthur did not purport to assess the accuracy

of Ellis's expert opinion. Nor was his testimony offered to establish an exact match between defendant's DNA profile and the profile obtained from the cigarette butt. Viewed in context, McArthur described his investigative process and recounted facts that led him to (1) identify defendant as a suspect and (2) obtain a buccal swab from defendant.

Additionally, we note that defendant is challenging some testimony his own trial counsel elicited from Chief Deputy McArthur on cross-examination:

> [DEFENSE COUNSEL]: Chief Deputy McArthur, you mentioned at some point in 2018, that you received a CODIS hit and that — tell me again what that alerted you of, the CODIS hit?
>
> . . .
>
> [MCARTHUR]: The CODIS hit alerted me that the state lab had an item of our evidence that they had been able to determine whose DNA was on that cigarette butt.
>
> . . .
>
> [MCARTHUR]: My understanding of the CODIS hit was that an item of evidence that we had submitted after this breaking and entering, the item being the cigarette butt, had been sent to the state lab. They had tested that item of evidence, that cigarette butt for DNA. They had located DNA on the cigarette butt and compared it to DNA standards, I think is the word, but the DNA profiles, that's a better way, the DNA profiles that were already in their system. When they did that comparison of the DNA that they found on the cigarette butt and the DNA that was already in their system, they determined that the DNA on the cigarette butt matched the DNA belonging to Joseph Stephen Jett.
>
> [DEFENSE COUNSEL]: Okay. And once you received

that, was it also your understanding that there was a mixture DNA profile, correct?

[MCARTHUR]: That's what the report notified me of, yes.

[DEFENSE COUNSEL]: And at that particular point in time, because we know we had the analyst come yesterday, did you understand what the mixture DNA was?

[PROSECUTOR]: Objection, Judge. This is outside the scope of this witness'[s] testimony being that the lab analyst yesterday would be able to testify regarding any type of what mixture means, et cetera. This witness is an investigator not to interpret DNA.

[DEFENSE COUNSEL]: Judge, I'm only asking if he knows what is in the report, the words in the report to which he made a conclusion meant.

THE COURT: Objection overruled. Let him testify if he knows.

[DEFENSE COUNSEL]: Yes. If he does, Judge. If he doesn't, that's fine.

[MCARTHUR]: I'm attempting to locate that copy of the report from the lab so I can make sure that —

[DEFENSE COUNSEL]: Take your time, sir.

[MCARTHUR]: — I'm seeking what you're seeing. Thank you. Okay. Can you ask me that again to make sure I answer your question.

[DEFENSE COUNSEL]: No problem. So where it says notification of CODIS hit, do you see where that's bolded?

. . .

[DEFENSE COUNSEL]: So what I'm showing to you is laboratory report notification of CODIS hit.

[MCARTHUR]: That report looks very similar to what I'm

looking at, but it's not the exact form. I —

[PROSECUTOR]: Objection, Judge. This report is not in evidence yet, and if this witness is testifying to the contents of the report, then it's not admissible at this moment.

THE COURT: If it's not in evidence, objection sustained.

[PROSECUTOR]: Thank you, Judge.

. . .

[DEFENSE COUNSEL]: You previously testified about a CODIS hit, correct?

[MCARTHUR]: Yes.

[DEFENSE COUNSEL]: Okay. Was your understanding of the CODIS hit that there was a mixture of DNA on it?

[PROSECUTOR]: Objection, Judge. Same objection.

THE COURT: Objection sustained.

We need not decide whether the State's objection to defense counsel's line of questioning precipitated the alleged error. Defendant at least partially invited the error he now asserts, and "[a] defendant is not prejudiced by . . . error resulting from his own conduct." N.C.G.S. § 15A-1443(c) (2023). A defendant who invites error waives appellate review of that error—including plain error—and statements elicited by the defense on cross-examination, even if erroneous, constitute invited error. *State v. Crane*, 269 N.C. App. 341, 343 (2020). In any event, assuming *arguendo* the admission of McArthur's testimony was erroneous, defendant has not shown prejudice because substantially similar evidence was admitted elsewhere. *State v.*

*Delau*, 381 N.C. 226, 237 (2022).  "[I]f certain evidence is admitted without objection, the admission of subsequent evidence of similar character cannot be objectionable." *Id.*

Even assuming the trial court erred in admitting the challenged testimony, "it cannot be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done . . . ." *Odom*, 307 N.C. at 660.  Defendant therefore has not met his burden of showing that admission of Chief Deputy McArthur's testimony constituted plain error.

**C.**

In his third argument, defendant challenges the trial court's restitution order of $1,118, contending it was not supported by sufficient evidence.  He notes the only receipts introduced by the State reflected costs of $266.89 and argues the restitution award should be limited to that amount.  We disagree.

"Whether the amount of restitution recommended by the trial court is supported by competent evidence adduced at trial or sentencing is reviewed by an appellate court *de novo*."  *State v. Hillard*, 258 N.C. App. 94, 97 (2018) (citing *State v. Wilson*, 340 N.C. 720, 726–27 (1995)).  "While defendant did not specifically object to the trial court's entry of an award of restitution, this issue is deemed preserved for appellate review under N.C. Gen. Stat. § 15A-1446(d)(18)."  *State v. Shelton*, 167 N.C. App. 225, 233 (2004) (citation omitted).

North Carolina law provides that "[t]he amount of restitution must be limited

to that supported by the record . . . ." N.C.G.S. § 15A-1340.36(a) (2023). Consistent with this mandate, "[a] trial court's judgment ordering restitution must be supported by evidence adduced at trial or at sentencing." *Mumford*, 364 N.C at 403. In determining the amount, the court must consider, in cases involving loss or destruction of property, "[t]he value of the property on the date of the damage, loss, or destruction." N.C.G.S. § 15A-1340.35(a)(2)(b)(1)–(2) (2023). The award "does not have to be supported by specific findings of fact or conclusions of law, and the quantum of evidence needed to support the award is not high. Rather, when there is some evidence that the amount awarded is appropriate, it will not be overruled on appeal." *Hillard*, 258 N.C. App. at 97 (citations omitted).

Our review of the record reveals *specific* evidence supporting the restitution award. The State introduced receipts showing $266.89 for replacement of Roberts's door, and Roberts testified that the total cost of installing a new door, seal, trim, and lock was between $1,200 and $1,400. The restitution amount of $1,118 did not include costs related to carpet repair or the unrecovered decorative shotgun. These facts are analogous to *State v. Hardy*, 242 N.C. App. 146, 160 (2015), where this Court held that a victim's testimony describing damages and necessary repairs caused by the defendant's actions was sufficient to show that restitution was "based on something more than a guess or conjecture . . . ."

We also note the trial court did not require the State to corroborate Roberts's testimony with additional documentation, nor was it required to do so. *See* N.C.G.S.

§ 15A-1340.35(b) (2023) (emphasis added) ("The court *may require* that the victim or the victim's estate provide admissible evidence that documents the costs claimed by the victim . . . ." Likewise, in *State v. Stephenson*, 267 N.C. App. 475, 483 (2019), this Court observed that although the State introduced a truck repair estimate, it "could have relied solely on . . . [the victim's] testimony to support the restitution amount." Thus, consistent with § 15A-1340.35(b) and *Stephenson*, the trial court had discretion to require additional evidence but was also permitted to rely solely on specific witness testimony to determine the proper restitution amount. Accordingly, the restitution order was supported by competent evidence.

**D.**

In his final argument, defendant contends the trial court erred by awarding his court-appointed attorney a fee "for an unknown number of hours and an unknown monetary amount without first giving [defendant] notice and opportunity to be heard." Upon review, we conclude this Court lacks jurisdiction to address the merits of this issue.

"We have previously determined that judgments entered against a defendant for attorney fees and appointment fees constitute civil judgments, which require a defendant to comply with Rule 3(a) of the North Carolina Rules of Appellate Procedure when appealing from those judgments." *State v. Patterson*, 269 N.C. App. 640, 642 (2020) (citation omitted). Rule 58 of our North Carolina Rules of Civil Procedure applies to all civil judgments entered in superior court, and states "a

judgment is entered when it is reduced to writing, signed by the judge, and filed with the clerk of court pursuant to Rule 5." § 1A-1, Rule 58 (2023). Here, defendant did not file written notice of appeal from a civil judgment awarding attorney's fees because no such judgment exists.

The transcript indicates the following colloquy occurred during the sentencing phase between the trial court, defendant's counsel, and defendant:

> THE COURT: Costs and attorney's fees to be a civil judgment. Do you have your hours?
>
> [DEFENSE COUNSEL]: I will submit them, Judge.
>
> THE COURT: Will there be anything further from the State?
>
> [PROSECUTOR]: Nothing further from the State, Judge.
>
> THE COURT: [Defense counsel] . . . , do you care to be heard?
>
> [DEFENSE COUNSEL]: Just two things, Judge. Notice of appeal and notice to withdraw.
>
> THE COURT: [Defendant] . . . , do you have any questions about this sentence?
>
> THE DEFENDANT: No, sir.

The Judgments and Commitments in 19CRS50234 and 19CRS50233 state that the trial court "further recommends" court costs "be a civil judgment." The court, however, did not enter a final civil judgment for costs or attorney's fees in accordance with Rule 58 of the Rules of Civil Procedure. Where a judgment or order is not entered in compliance with Rule 58, it is not effective. *Onslow Cnty. v. Moore*, 129

N.C. App. 376, 388–89 (1998).  Both this Court and our Supreme Court have held that, absent entry of a judgment or order, an appellate court lacks jurisdiction to review the matter.  *State v. Jacobs*, 361 N.C. 565, 566 (2007) (concluding that because "there is no civil judgment in the record ordering defendant to pay attorney fees, th[is] Court . . . had no subject matter jurisdiction on this issue").

In sum, we lack jurisdiction to review a non-existent civil judgment for attorney's fees.  *See Munchak Corp. v. McDaniels*, 15 N.C. App. 145, 147–48 (1972) (explaining that without entry of a final judgment or order, the judgment or order has no effect and is not reviewable on appeal).  We therefore dismiss this issue without prejudice.

## III.

Defendant did not preserve his challenge to allegedly inconsistent verdicts, and we decline to invoke Rule 2 to reach the merits.  His claim of plain error regarding the admission of Chief Deputy McArthur's testimony is without merit.  The restitution order was supported by competent evidence, and we lack jurisdiction to review defendant's challenge to attorney's fees in the absence of a civil judgment.

NO ERROR.

Judges COLLINS and WOOD concur.