DAVIS, Judge.
 

 *708
 
 Travis Lamont Daughtridge ("Defendant") appeals from his convictions for first-degree murder and possession of a firearm by a felon. On appeal, he contends that the trial court plainly erred by allowing the admission of (1) an investigator's testimony concerning Defendant's demeanor; and (2) opinion testimony from a medical examiner that the victim's death was a homicide rather than a suicide. After careful
 
 *709
 
 review, we conclude that Defendant received a fair trial free from prejudicial error.
 

 Factual Background
 

 The State presented evidence at trial tending to establish the following facts: In 2011, Simeka Daughtridge ("Simeka") lived with her three children at her mother's house on Spruce Street in Durham, North Carolina. Her mother, Linda Sanders ("Linda"), and her brother, Kevin Surratt ("Kevin"), also lived at the Spruce Street address along with Kevin's girlfriend and their infant son.
 

 On 26 August 2011, Simeka married Defendant, who periodically stayed with Simeka at Linda's residence. However, their relationship began to deteriorate soon after their marriage.
 

 On 30 October 2011, while Defendant was at Linda's house, Defendant and Simeka began arguing in Simeka's bedroom. The door was shut, and they were alone together in the room. Linda was at church and Kevin, his girlfriend, and their son were in Kevin's bedroom. Simeka's children were watching television in the living room.
 

 Approximately 10-15 minutes after Defendant and Simeka began arguing, Simeka's eldest daughter heard a gunshot from the direction of Simeka's room and observed Defendant run out of the room a few seconds later. Simeka's son also heard a "loud noise" and the sound of shattering glass coming from Simeka's bedroom. He too saw Defendant run out of the room several seconds later.
 

 Defendant, upon seeing the children, yelled: "[Y]our mom shot herself." He then shouted in the direction of Kevin's room: "Your sister shot herself." Kevin immediately ran into Simeka's room while his girlfriend called 911. Kevin discovered Simeka laying on her bed on her left side with an apparent bullet wound to her chest. He attempted to perform first aid by rolling Simeka onto her back and applying pressure to the wound with a towel. Defendant stood in the doorway
 
 *669
 
 for several seconds and then fled from the house.
 

 Officers with the Durham Police Department ("DPD") responded to the scene at approximately 2:00 p.m., and emergency medical personnel arrived shortly thereafter. Simeka was transported via ambulance to Duke University Medical Center. Upon arrival, she was pronounced dead.
 

 Upon examining Simeka's bedroom, law enforcement officers discovered a .9 millimeter Kel-Tec semi-automatic handgun laying on the floor roughly three feet from Simeka's body. They also discovered a
 
 *710
 
 bullet inside a washing machine in the bedroom that had passed through the glass door of the machine and shattered it.
 

 Approximately one hour after the shooting had occurred, Defendant returned to Linda's house. He then told one of the officers that Simeka had shot herself.
 

 Detective David Anthony ("Detective Anthony") with the DPD spoke with Defendant in his patrol car parked outside of the residence. Detective Anthony told Defendant that he was not under arrest but asked him if he would be willing to come to the police station to be interviewed. Defendant agreed, and while at the police station he voluntarily surrendered his clothing for gunshot residue ("GSR") analysis.
 

 Defendant provided a written statement in which he stated that he and Simeka had been talking in her bedroom and that he had then left the bedroom and gone to the living room when he heard a gunshot. He shouted to Kevin that Simeka had shot herself and did not thereafter reenter Simeka's room because "[he] just couldn't do it." Instead, he ran to a neighbor's house.
 

 Investigator Charles Sole ("Investigator Sole") was assigned as the lead investigator of the case. Upon reviewing the written statement Defendant had given to Detective Anthony, Investigator Sole decided to schedule a follow-up interview with Defendant because based on his training and experience certain parts of Defendant's account of the incident "were just not adding up."
 

 Prior to the follow-up interview with Defendant, Investigator Sole received the results of the GSR analysis that had been performed on Defendant and his clothing. The analysis revealed that particles of GSR were present on Defendant's t-shirt, jeans, and hooded jacket. Investigator Sole interviewed Defendant once more on 9 November 2011. He ultimately arrested Defendant on 7 December 2011 for the murder of Simeka.
 

 On 12 December 2011, Defendant was indicted on charges of first-degree murder and possession of a firearm by a felon. Beginning on 27 September 2014, a jury trial was held before the Honorable Henry W. Hight, Jr. in Durham County Superior Court.
 

 At trial, the State introduced the testimony of Dr. Eric Duval ("Dr. Duval"), a forensic pathologist and medical examiner. Dr. Duval testified as an expert in the field of forensic pathology. He opined that the cause of death was a bullet wound to Simeka's chest. He further stated his opinion that "the manner of death [was] homicide."
 

 *711
 
 The State also offered the testimony of David Freehling ("Freehling"), an expert in the field of GSR testing, who testified that while Simeka's hands and clothing had tested negative for GSR, Defendant's t-shirt, hooded jacket, and jeans all tested positive for GSR with one particle of GSR found on each of these three articles of clothing.
 

 While Defendant did not testify, he attempted to establish during his case-in-chief that Simeka's death was a suicide. In support of this theory, defense counsel re-called Detective Anthony as a witness and examined him on the subject of why law enforcement officers had not investigated more extensively the theory that Simeka killed herself.
 

 Defendant also called Kevin as a witness, who testified that Simeka had exhibited suicidal tendencies prior to her death and had threatened to kill herself on at least one prior occasion. Kevin further stated that Simeka was depressed and unhappy as a result of her deteriorating relationship with Defendant.
 

 In addition, Defendant introduced testimony from his own GSR expert, Robert White, who testified that he would typically expect
 
 *670
 
 more than three particles of GSR to be present on the clothing of an individual who had fired a gun. Finally, Defendant presented the testimony of Dr. Christina Roberts, an expert in forensic pathology, who stated that she was unable to determine whether Simeka's manner of death was homicide or suicide.
 

 The jury found Defendant guilty of both charges. The trial court sentenced Defendant to consecutive sentences of life imprisonment without parole for his first-degree murder conviction and 19-23 months imprisonment for his conviction of possession of a firearm by a felon.
 

 Analysis
 

 I. Appellate Jurisdiction
 

 Initially, we must determine whether we have jurisdiction over Defendant's appeal.
 
 See
 

 Hous. Auth. of City of Wilmington v. Sparks Eng'g, PLLC,
 

 212 N.C.App. 184
 
 , 187,
 
 711 S.E.2d 180
 
 , 182 (2011) ("As an initial matter, we must address the extent, if any, to which Defendant's appeal is properly before us. An appellate court has the power to inquire into jurisdiction in a case before it at any time, even
 
 sua sponte.
 
 " (citation, quotation marks, and brackets omitted)). The State challenges the sufficiency of Defendant's notice of appeal and argues that his appeal should be dismissed. Defendant contends that notice of appeal was properly given, but, out of an abundance of caution, he also filed a
 
 *712
 
 petition for writ of
 
 certiorari
 
 with this Court in the event we determine that his purported notice was, in fact, defective.
 

 At the conclusion of trial, the following colloquy took place between Defendant's trial counsel and the trial court:
 

 MR. MEIER: Yeah, Your Honor, just motion to dismiss JNOV [sic] as well as request and [sic] an appellate public defender to be appointed.
 

 THE COURT: Motion [to] set aside the verdict is denied.
 

 MR. MEIER: Yes, sir.
 

 THE COURT: Motion of appeal is noted to the-I guess to the Supreme Court of North Carolina to the Appellate Division, State of North Carolina. I will appoint[ ] the appellate defender to represent the Defendant. He's in your custody, Mr. Sheriff.
 

 While this exchange is admittedly not a model of clarity, we nevertheless interpret it as manifesting Defendant's intention to enter a notice of appeal to this Court. In response to Defendant's trial counsel's request, the trial court ordered that the Office of the Appellate Defender be appointed to represent Defendant before this Court. Moreover, the State does not contend that it was misled or prejudiced in any way by any defect in Defendant's notice of appeal.
 

 We therefore hold that Defendant's oral notice of appeal was sufficient to confer jurisdiction upon this Court.
 
 See
 

 State v. Williams,
 

 235 N.C.App. 201
 
 , 203,
 
 761 S.E.2d 662
 
 , 664 (2014) ("Accordingly, as defendant's intent to appeal can be fairly inferred and the State provides no indication it was misled by the defendant's mistake, we do not dismiss defendant's appeal on the basis of a defect in the notice of appeal."),
 
 appeal dismissed and disc. review denied,
 

 368 N.C. 241
 
 ,
 
 768 S.E.2d 857
 
 (2015). Consequently, we deny the State's motion to dismiss the appeal, dismiss Defendant's petition for writ of
 
 certiorari
 
 as moot, and proceed to address the merits of Defendant's arguments.
 

 II. Testimony of Investigator Sole Regarding Defendant's Demeanor
 

 Defendant's first argument on appeal is that the trial court committed plain error by allowing Investigator Sole to testify as to his perception of Defendant's demeanor. We disagree.
 

 Defendant failed to object at trial to the testimony he now challenges on appeal. Therefore, our review is limited to plain error.
 
 See
 

 *713
 
 N.C.R.App. P. 10(a)(4) ("In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.").
 

 *671
 
 For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice-that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.
 

 State v. Lawrence,
 

 365 N.C. 506
 
 , 518,
 
 723 S.E.2d 326
 
 , 334 (2012) (internal citations, quotation marks, and brackets omitted).
 

 Defendant's argument on this issue is based primarily on the following portions of Investigator Sole's testimony on direct examination:
 

 Q. Please explain the circumstances under which you scheduled that interview?
 

 A. Like I said in an investigation like this we're objective. And I had contacted Mr. Daughtridge to followup [sic] on his initial statement with Detective Anthony and also I had some questions myself that we had developed since his conversation with Anthony.
 

 Q. Now, you had reviewed his statement. Were there things that concerned you that you wanted to followup [sic] on?
 

 A. Yes.
 

 Q. What were the things that concerned you?
 

 A. I mean, initially the day of the incident, having responded to other death investigations and now an allegation of being a suicide, things were just not adding up.
 

 Q. So you had investigated other death investigations where it was determined it had been a suicide?
 

 *714
 
 A. I've been on numerous [sic] throughout my career. But as the lead investigator, yes, I had been involved in several of them as an assisting [sic] to the lead investigator.
 

 Q. Specifically, when you said things didn't add up, what drew your concerns?
 

 A. I mean, the initial thing was is [sic] that his demeanor and his-the statements that he had left the scene. I mean, that's just not consistent with a suicide particularly of your wife. I mean, generally, we have to remove the persons from the scene and try to keep them out. I mean, he was very disengaged. That was really odd to me.
 

 Q. Was there anything else that concerned you at that time since taking his statement?
 

 A. Again, a lot of it was based on just his demeanor. There was no, you know, emotion that he was upset. It appeared there was-it was more of supporting his theory of what had happened and him not being in a room than what had happened to his wife.
 

 Q. Now, at that time were you aware of-had the children spoken to you at that time?
 

 A. There was comments brought back to me from the victim's mother that [sic] what the children were saying. I mean, technically in our unit we usually defer child interviews to folks that have that expertise. So I contacted a couple of the juvenile investigators to try to make that process happen. But there were comments from coming [sic] from the family and the victim's mother about the children regarding what they had seen.
 

 ....
 

 Q. Prior to this recorded statement, did he provide that information to any other law enforcement during any questioning about this physical altercation between himself and Ms. Daughtridge?
 

 A. Not to my knowledge. I mean, looking at the interview [sic] Detective Anthony and again with me, I had to pull it out of him. I didn't understand why he would-he wouldn't
 
 *715
 
 be just forthright with it. Everything that had occurred were [sic], you know, concerning his wife.
 

 ....
 

 Q. And although he did not state it during the beginning portion, was there-at the end did he indicate in fact there had been other contact with his body with a gun that was being handled by Ms. Daughtridge?
 

 *672
 
 A. Yes. I mean, on several occasions he was contradicting what he was confronted with.
 

 ....
 

 Q. Once you had talked to David Freehling at the State Crime Lab, what was the next step in the investigation?
 

 A. Obviously, we waited to get all of his reports back and any information regarding the gunshot residue. You know, by that time we had conducted some other interviews that, again, it just didn't add up to-it wasn't adding up that she had shot herself, when those-with the totality of those things.
 

 Defendant specifically challenges the following statements from the above-quoted testimony: (1) "things were just not adding up"; (2) "the initial thing was is [sic] that his demeanor and his-the statements that he had left the scene. I mean, that's just not consistent with a suicide particularly of your wife. I mean, generally, we have to remove the persons from the scene and try to keep them out. I mean, he was very disengaged. That was really odd to me"; (3) "a lot of it was based on just his demeanor. There was no, you know, emotion that he was upset. It appeared there was-it was more of supporting his theory of what had happened and him not being in a room than what had happened to his wife"; (4) "I mean, on several occasions he was contradicting what he was confronted with"; (5) "I mean, looking at the interview [sic] Detective Anthony and again with me, I had to pull it out of him. I didn't understand why he would-he wouldn't be just forthright with it. Everything that had occurred were, you know, concerning his wife"; and (6) "[b]y that time we had conducted some other interviews that, again, it just didn't add up to-it wasn't adding up that she had shot herself, when those-with the totality of those things." Defendant asserts that these statements constituted impermissible lay opinions in violation of Rule 701 of the North Carolina Rules of Evidence.
 

 *716
 
 Defendant is correct as a general proposition that "when one witness vouches for the veracity of another witness, such testimony is an opinion which is not helpful to the jury's determination of a fact in issue and is therefore excluded by Rule 701 [of the North Carolina Rules of Evidence]."
 
 State v. Gobal,
 

 186 N.C.App. 308
 
 , 318,
 
 651 S.E.2d 279
 
 , 286 (2007) (citation, quotation marks, and brackets omitted),
 
 aff'd per curriam,
 

 362 N.C. 342
 
 ,
 
 661 S.E.2d 732
 
 (2008) ;
 
 see also
 

 State v. White,
 

 154 N.C.App. 598
 
 , 605,
 
 572 S.E.2d 825
 
 , 831 (2002) ("The jury is charged with drawing its own conclusions from the evidence, and without being influenced by the conclusion of [a law enforcement officer].").
 

 However, it is apparent from the context of Investigator Sole's testimony on direct examination that he was simply explaining the steps he took in furtherance of his ongoing investigation. His statements expressing skepticism over Defendant's account of these events served merely to provide context and explain his rationale for continuing to subject Defendant to additional scrutiny.
 

 Such testimony does not run afoul of Rule 701. Indeed, we have expressly held that "[t]estimony elicited to assist the jury in understanding a law enforcement officer's investigative process is admissible under Rule 701."
 
 State v. Bishop,
 
 --- N.C.App. ----, ----,
 
 774 S.E.2d 337
 
 , 347,
 
 rev'd on other grounds,
 
 - -- N.C. ----,
 
 787 S.E.2d 814
 
 (2016).
 

 We find instructive our opinion in
 
 State v. Lawson,
 

 159 N.C.App. 534
 
 ,
 
 583 S.E.2d 354
 
 (2003), in which the defendant was charged with robbery with a firearm and possession of a firearm by a felon. The defendant robbed a convenience store at gunpoint and then fled. The store clerk called the police, and descriptions of the defendant and his accomplice were provided by the clerk and another witness.
 
 Id.
 
 at 535-36,
 
 583 S.E.2d at 355-56
 
 .
 

 Approximately two hours later, an officer pulled over a car driven by the defendant for running a stoplight. When the officer asked the defendant for his driver's license, he was unable to produce any identification but told the officer his name was Antonio Lawson. The officer ran a DMV identification check for the name "Antonio Lawson," but the search returned no record of any such individual.
 
 Id.
 
 at 536,
 
 583 S.E.2d at 356
 
 .
 

 *673
 
 At trial, the officer testified that " '[a]t that point I knew that he was lying to me because if you've ever had a North Carolina ID whether it be three days ago, three years ago, thirty years ago, your information is in DMV files. With that name and that DOB there was no information. He
 
 *717
 
 had already stated to me that he had a North Carolina ID so I knew at that point he was lying.' "
 
 Id.
 
 at 541,
 
 583 S.E.2d at 359
 
 .
 

 On appeal, the defendant argued that the trial court committed plain error in admitting this portion of the officer's testimony because it "intimated defendant was a liar."
 
 Id.
 
 at 540,
 
 583 S.E.2d at 359
 
 . We rejected this argument, noting that
 

 in contrast to defendant's contentions on appeal, Officer Wilson did not characterize defendant as "a liar." In reviewing the testimony, it appears instead that Officer Wilson's testimony as to defendant's lying dealt with: (1) the special circumstances of asking for defendant's identification during a traffic stop, (2)
 
 why defendant's responses aroused Officer Wilson's suspicion,
 
 and (3) explaining why Officer Wilson initially arrested defendant for providing fictitious information.
 

 Id.
 
 at 542,
 
 583 S.E.2d at 359
 
 (emphasis added).
 

 We held that "[i]n the present case, Officer Wilson's testimony was not that of an expert as to credibility; further, he was not invading the province of the jury as he was not commenting on the credibility of a witness. As noted above, Officer Wilson was testifying to the circumstances of the traffic stop and the reason for defendant's detention. The above testimony by Officer Wilson does not rise to the level of plain error."
 
 Id.
 
 at 542,
 
 583 S.E.2d at 360
 
 .
 

 As in
 
 Lawson,
 
 we believe the testimony offered by Investigator Sole during direct examination served to assist the jury in understanding his investigative process and why he chose to continue investigating Defendant instead of accepting Defendant's explanation of the events of 30 October 2011 at face value. Such testimony does not speak to the ultimate issue of Defendant's guilt or innocence and was therefore admissible under Rule 701.
 
 See
 

 State v. Houser,
 
 --- N.C.App. ----, ----,
 
 768 S.E.2d 626
 
 , 631-32 ("[The officer] was not invading the province of the jury by commenting on the truthfulness of defendant's statements and subsequent testimony. Rather, he was explaining the investigative process.... [S]tatements were rationally based on [the officer's] experience as a detective and were helpful to the jury in understanding the investigative process in this case.... [W]e hold that the trial court's admission of this testimony was not error, let alone plain error."),
 
 disc. review denied,
 
 - -- N.C. ----,
 
 775 S.E.2d 869
 
 (2015).
 

 *718
 
 Defendant contends that Investigator Sole's testimony concerning certain text messages sent from Simeka's cellphone also constituted improper lay opinion testimony in violation of Rule 701. The text messages at issue were examined by Investigator Sole for the purpose of determining whether Simeka's death was a suicide. Specifically, Defendant points to the following exchange during his direct examination:
 

 Q. Now, the text messaging was that of any importance to you?
 

 A. I mean, it's again a standard procedure during a death investigation to look at those type of records. When I looked at them in this case predominantly what I was looking at it is as we said you're trying to be objective it being a death investigation. And there being this allegation of suicide that if there was any type of messaging that would be consistent with her being upset, you know, making-maybe telling someone else in a text message, this type of stuff.
 

 And it wasn't present so it didn't appear to have anything in that direction. The text messaging seemed to be fairly normal and not what I would consider-she was holding a conversation with someone about I think things getting better or there were other options for her based on her-what things were with her current relationship.
 

 We believe these statements likewise provided context for Investigator Sole's decision-making with regard to his investigation. This portion of Investigator Sole's testimony further explains why he conducted a homicide investigation rather than concluding that
 
 *674
 
 Simeka's death was a suicide. Defendant has failed to offer any persuasive argument that the admission of this evidence constituted plain error.
 

 Finally, Defendant challenges the following testimony offered by Investigator Sole on cross-examination as violative of Rule 701 :
 

 Q. Okay. But as an investigator you're ascribing motives and thoughts to everybody. You assumed my client was deceptive, correct?
 

 A. He was deceptive.
 

 ....
 

 Q. But so when [Linda] makes mistaken statements of fairly significant facts, maybe she was mistaken, maybe
 
 *719
 
 she was wrong. [Defendant] is deceitful, correct, that's your opinion?
 

 A. The things that [Defendant] was not truthful about were significant to a death investigation. That's why I define it as deception.
 

 However, while Defendant argues that Investigator Sole's characterization of him as "deceptive" was improper, the above-quoted exchange falls squarely within the invited error doctrine. "Statements elicited by a defendant on cross-examination are, even if error, invited error, by which a defendant cannot be prejudiced as a matter of law."
 
 Gobal,
 

 186 N.C.App. at 319
 
 ,
 
 651 S.E.2d at
 
 287 ;
 
 State v. Steen,
 

 226 N.C.App. 568
 
 , 575,
 
 739 S.E.2d 869
 
 , 875 (2013) ("Statements elicited by a defendant on cross-examination are, even if error, invited error, by which a defendant cannot be prejudiced as a matter of law, and a defendant who invites error has waived his right to all appellate review concerning the invited error,
 
 including plain error review.
 
 " (internal citations, quotation marks, and alterations omitted and emphasis added)).
 

 Investigator Sole's statements on cross-examination were direct responses to the questions of Defendant's trial counsel. Consequently, based on the invited error doctrine, the challenged testimony cannot constitute plain error.
 

 III. Dr. Duval's Testimony
 

 Defendant's final argument on appeal is that the trial court erred in allowing Dr. Duval to testify as to his opinion that Simeka's death was a homicide. Specifically, Defendant contends that because Dr. Duval's opinion on this issue was based not on medical findings within his area of expertise but rather on non-medical information relayed to him by law enforcement officers, the trial court erred by allowing its admission. While acknowledging that prior cases from North Carolina courts have allowed analogous expert testimony from medical examiners,
 
 see
 

 State v. Annadale,
 

 329 N.C. 557
 
 ,
 
 406 S.E.2d 837
 
 (1991) ;
 
 State v. Borders,
 

 236 N.C.App. 149
 
 ,
 
 762 S.E.2d 490
 
 (2014),
 
 disc. review denied,
 
 - -- N.C. ----,
 
 772 S.E.2d 726
 
 (2015), he argues that the General Assembly's 2011 amendment to Rule 702 of the North Carolina Rules of Evidence now requires trial courts to serve in a stricter "gatekeeper" capacity when considering the admissibility of expert testimony. Because Defendant failed to object to this portion of Dr. Duval's testimony at trial, our review is-once again-limited to plain error.
 
 Lawrence,
 

 365 N.C. at 518
 
 ,
 
 723 S.E.2d at 334
 
 .
 

 *720
 
 Our Supreme Court has very recently confirmed that the General Assembly's amendment to Rule 702 adopted the federal standard for the admission of expert witness testimony set forth in
 
 Daubert v. Merrell Dow Pharm., Inc.,
 

 509 U.S. 579
 
 ,
 
 113 S.Ct. 2786
 
 ,
 
 125 L.Ed.2d 469
 
 (1993), and its progeny.
 
 See
 

 State v. McGrady,
 

 368 N.C. 880
 
 , ----,
 
 787 S.E.2d 1
 
 , 5 (2016) ("We hold that the 2011 amendment adopts the federal standard for the admission of expert witness testimony articulated in the
 
 Daubert
 
 line of cases. The General Assembly amended North Carolina's rule in 2011 in virtually the same way that the corresponding federal rule was amended in 2000. It follows that the meaning of North Carolina's Rule 702(a) now mirrors that of the amended federal rule.").
 

 Rule 702 now provides, in pertinent part, as follows:
 

 (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an
 
 *675
 
 expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
 

 (1) The testimony is based upon sufficient facts or data.
 

 (2) The testimony is the product of reliable principles and methods.
 

 (3) The witness has applied the principles and methods reliably to the facts of the case.
 

 N.C.R. Evid. 702(a).
 

 In
 
 McGrady,
 
 the Supreme Court discussed in detail the implications stemming from the amendment to Rule 702.
 

 Rule 702(a) has three main parts, and expert testimony
 
 must satisfy each to be admissible.
 
 First, the area of proposed testimony must be based on scientific, technical or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue. This is the relevance inquiry discussed in both
 
 Daubert
 
 and
 
 Howerton.
 
 As with any evidence, the testimony must meet the minimum standard for logical relevance that Rule 401 establishes. In other words, the testimony must relate to an issue in the case. But relevance means something more for expert testimony.
 
 In
 

 *721
 

 order to assist the trier of fact, expert testimony must provide insight beyond the conclusions that jurors can readily draw from their ordinary experience. An area of inquiry need not be completely incomprehensible to lay jurors without expert assistance before expert testimony becomes admissible. To be helpful, though, that testimony must do more than invite the jury to substitute the expert's judgment of the meaning of the facts of the case for its own.
 

 Second, the witness must be qualified as an expert by knowledge, skill, experience, training, or education. This portion of the rule focuses on the witness's competence to testify as an expert in the field of his or her proposed testimony. Expertise can come from practical experience as much as from academic training. Whatever the source of the witness's knowledge, the question remains the same: Does the witness have enough expertise to be in a better position than the trier of fact to have an opinion on the subject? The rule does not mandate that the witness always have a particular degree or certification, or practice a particular profession. But this does not mean that the trial court cannot screen the evidence based on the expert's qualifications. In some cases, degrees or certifications may play a role in determining the witness's qualifications, depending on the content of the witness's testimony and the field of the witness's purported expertise. As is true with respect to other aspects of Rule 702(a), the trial court has the discretion to determine whether the witness is sufficiently qualified to testify in that field.
 

 Third, the testimony must meet the three-pronged reliability test that is new to the amended rule: (1) The testimony must be based upon sufficient facts or data. (2) The testimony must be the product of reliable principles and methods. (3) The witness must have applied the principles and methods reliably to the facts of the case. These three prongs together constitute the reliability inquiry discussed in
 
 Daubert, Joiner,
 
 and
 
 Kumho.
 
 The primary focus of the inquiry is on the reliability of the witness's principles and methodology, not on the conclusions that they generate. However, conclusions and methodology are not entirely distinct from one another, and when a trial court
 
 *722
 
 concludes that there is simply too great an analytical gap between the data and the opinion proffered, the court is not required to admit opinion evidence that is connected to existing data only by the
 
 ipse dixit
 
 of the expert.
 

 McGrady,
 

 368 N.C. at 889-90
 
 , 787 S.E.2d at 8-9. (internal citations, quotation marks, and brackets omitted and emphasis added).
 

 The Supreme Court's analysis in
 
 McGrady
 
 -which the trial court did not have the benefit of at the time of Defendant's trial-makes clear that trial courts must now perform a more rigorous gatekeeping function when determining the admissibility of opinion testimony by expert witnesses than was the case under the prior version of Rule 702. Here, Dr. Duval's opinion that Simeka's
 
 *676
 
 death was a homicide as opposed to a suicide appears to have been largely-if not entirely-based on his interpretation of
 
 non-medical
 
 information conveyed to him by law enforcement officers who were involved in the investigation of Simeka's death.
 

 Q. Did you take into consideration statements made by witnesses at the scene as far as the circumstances related to the moments before and after Simeka Daughtridge was shot?
 

 A. Yes.
 

 Q. And could you please tell the jury the information that you considered as far as the circumstances of the moments before and after she was shot?
 

 A. It was relayed to me by law enforcement that eyewitnesses stated that there was some sort of verbal altercation occurring in the bedroom in which the decedent was in. A loud sound or a pop or something analogous to a gunshot was heard and then a person was seen to emerge from the room.
 

 Q. And the person that was seen to emerge from the room, do you know who that was?
 

 A. I believe it was described as the decedent's boyfriend.
 

 Q. And were you informed as to what he had told the police as far as whether or not that was consistent [sic] what other witnesses observed?
 

 A. I believe that again, according to information provided to me from law enforcement, was [sic] that the decedent's
 
 *723
 
 boyfriend claimed that he was not in the room with the decedent at the time that the gunshot was heard.
 

 Q. As a result of all of the information that you took into consideration, did you form an opinion as to whether or not Simeka Daughtridge was the victim of homicide?
 

 A. Yes.
 

 Q. And based on all the information that you were provided as well as the testing that you performed yourself, what was your expert opinion as to whether or not she was the victim of homicide?
 

 A. In my opinion the manner of death is homicide.
 

 Dr. Duval further testified during cross-examination as follows:
 

 Q. Okay. A few other questions. The information you had received was from law enforcement only, correct, as far as what the-
 

 A. To my recollection.
 

 Q. -as to the cause and manner of death?
 

 A. Yes.
 

 ....
 

 Q. Okay. Outside of what law enforcement told you, is there anything about the wound itself that would indicate that it could not have been self-inflicted?
 

 A. No.
 

 We believe Defendant has raised legitimate concerns about the admissibility of Dr. Duval's opinion testimony on the issue of whether Simeka's death was a homicide. Clearly, Dr. Duval would have been qualified to provide an opinion that Simeka's death was a homicide-rather than a suicide-if that opinion was based on the type of evidence that was within his area of expertise as an expert witness in the field of forensic pathology. However, based on our review of the trial transcript, it is difficult to escape the conclusion that his opinion on this specific issue was based not on such medical evidence but instead on statements from law enforcement officers about the results of their investigation-information that bore little, if any, connection to his own observations stemming from his autopsy of Simeka.
 

 *724
 
 The State has failed to adequately explain how Dr. Duval was in a better position than the jurors to evaluate whether the results of the officers' investigation were more suggestive of a homicide than a suicide. Therefore, based on the principles set out in
 
 McGrady,
 
 his opinion failed to pass muster under the new test governing the admissibility of expert witness opinion testimony that is now required in light of the 2011 amendment to Rule 702.
 

 However, we are not convinced that the trial court's error in allowing Dr. Duval
 
 *677
 
 to give this opinion rose to the level of plain error. This is so for several reasons.
 

 First, the results of the GSR testing are inconsistent with the theory that Simeka committed suicide. The State's evidence established that had Simeka, in fact, shot herself, GSR would have been present on her hands. However, no GSR was discovered on her hands during forensic testing. During direct examination, Freehling offered the following testimony:
 

 Q. And if somebody was to have shot themselves and died as a result of that gunshot wound shortly after shooting themselves, would you expect there to be gunshot residue on their hands?
 

 A. It's depending on the caliber of the weapon and if the body was touched or the hands were touched or anything that could lead to the lost [sic] of particles. You would expect to find particles on the hands of someone that shot themselves if it was as is. But then there's factors that lead to particle loss which could be the caliber of the weapon, if EMTs touched the body or while transferring to the hospital, anything [sic] of those factors could lead to particle loss.
 

 Q. Now, you talked about caliber. A .9 millimeter would you consider that a small caliber?
 

 A. That's higher caliber. The smaller calibers were [sic] little to no gunshot residue submitted are typically .22 caliber and .25 caliber.
 

 Q. And as far as you had talked about medical personnel, if there's no medical intervention as far as cleaning of the hands or medical procedures on the hands, that would not then affect a loss of gunshot residue; is that correct?
 

 *725
 
 A. That's correct.
 

 Freehling also testified that "[GSR] expands up to a few feet from the weapon. So the further away you get from the weapon, the less likely you are to have gunshot residue on you." He further testified as follows:
 

 Q. And as far as if there's gunshot residue mixed in with, say, blood can you still detect that gunshot residue?
 

 A. Yes.
 

 Significantly, Simeka's blood-stained hands were not disturbed following the shooting as reflected by a Duke University Medical Center report prepared by Dr. Catherine Lynch, who stated therein that "[Simeka] was prepped for autopsy/police investigation with bags placed on her hands and was not wiped clean per my request." Moreover, when Simeka's body was delivered to Dr. Duval for autopsy, he observed that "I saw what appeared to be dried blood stains on [her] hands."
 

 Consequently, the preservation of Simeka's hands in an undisturbed state for forensic testing and the total lack of
 
 any
 
 GSR on them forecloses the possibility that she shot herself. Furthermore, Simeka was shot with a .9 millimeter high caliber handgun as opposed to a smaller caliber handgun that-as Freehling noted-might not leave appreciable traces of GSR.
 

 Defendant's clothing, conversely, tested positive for the presence of GSR despite his assertion during his interview with Investigator Sole that he had not been in Simeka's room at the time of the shooting. Given Freehling's testimony that GSR only travels "three to four feet ... maximum" from a fired .9 millimeter gun and that the "cloud is only in the air for a matter of seconds" before the particles fall to the ground, the fact that three separate pieces of Defendant's clothing-his t-shirt, jeans, and hooded jacket-all tested positive for GSR clearly indicates that he was, in fact, present in Simeka's bedroom within several feet of the Kel-Tec .9 millimeter weapon at the time she was shot.
 
 [1]
 

 Second, both of Simeka's children who testified at trial stated that Defendant exited Simeka's room
 
 after
 
 they heard the gunshot. No witness at trial who was present in the house at the time of the shooting testified to the contrary.
 

 *678
 

 *726
 
 Third, the fact that Defendant made no effort to tend to Simeka and actually left the residence prior to the arrival of law enforcement officers or emergency medical personnel serves as circumstantial evidence of Defendant's guilt.
 
 See
 

 State v. Bagley,
 

 183 N.C.App. 514
 
 , 521,
 
 644 S.E.2d 615
 
 , 620 (2007) ("[E]vidence of flight is admissible if offered for the purpose of showing defendant's guilty conscience as circumstantial evidence of guilt of the crime for which he is being tried[.]");
 
 State v. Page,
 

 169 N.C.App. 127
 
 , 137,
 
 609 S.E.2d 432
 
 , 438 (2005) ("The State presented evidence that defendant did not render assistance in reviving [the victim] or contact emergency personnel regarding the shooting. Defendant's hands were shown to contain gunshot residue.... Additionally, defendant's inconsistent statements regarding his location during the shooting is circumstantial evidence of defendant's guilt.").
 

 Finally, any prejudicial effect from the erroneous admission of Dr. Duval's opinion on the manner of Simeka's death was mitigated during cross-examination by Defendant's trial counsel:
 

 Q. If you had been told that a victim, that a deceased person was suicidal, had attempted suicide, and in fact had the day before told her children, mom, was not going to be with you much longer, would you have considered that in determining whether something was a homicide or suicide?
 

 A. Sure.
 

 Q. But if you're not told that, you can't consider it in making your determination?
 

 A. Yes.
 

 Q. Were you told any of that in this case?
 

 A. Not to my recollection.
 

 ....
 

 Q. Do you know if the victim in this case ever expressed thoughts of killing herself?
 

 A. I have no idea.
 

 Q. Did you talk to the family and ask them about that?
 

 A. No.
 

 Q. Did you ask the police if she had any of that?
 

 *727
 
 A. I don't know.
 

 ....
 

 Q. But at the time, you never even considered the self inflicted angle because it was never communicated to you?
 

 A. No.
 

 Q. And there's nothing about the autopsy itself per her wound that would tell you there's no way she could have done this herself?
 

 A. That is the shortcoming of an autopsy.
 

 Q. But that wound, and that type, where it was, and everything else, you've seen wounds like that that are self-inflicted?
 

 A. Yes.
 

 Furthermore, as noted earlier, the jury heard Dr. Duval explicitly admit during cross-examination that his opinion that Simeka did not commit suicide was based entirely on non-medical information he received from law enforcement officers.
 

 Q. Okay. A few other questions. The information you had received was from law enforcement only, correct, as far as what the-
 

 A. To my recollection.
 

 Q. -as to the cause and manner of death?
 

 A. Yes.
 

 ....
 

 Q. Okay. Outside of what law enforcement told you, is there anything about the wound itself that would indicate that it could not have been self-inflicted?
 

 A. No.
 

 Thus, as a result of defense counsel's cross-examination of Dr. Duval, the jury was expressly told that in forming his opinion as to Simeka's manner of death (1) he had not been made aware of any of Defendant's evidence suggesting Simeka had a motive to commit suicide; (2) he instead relied exclusively on the information the officers had
 
 *728
 
 related to him about their investigation; and (3) nothing from his analysis of Simeka's body during the autopsy shed light on whether the death was a homicide rather than a suicide. These admissions would have led a reasonable juror to place Dr. Duval's stated opinion on the manner of death in its proper context.
 
 *679
 
 For these reasons, we conclude that the admission of Dr. Duval's opinion testimony did not amount to plain error.
 
 See, e.g.,
 

 State v. Turbyfill,
 
 --- N.C.App. ----, ----,
 
 776 S.E.2d 249
 
 , 259 ("[The expert witness'] testimony appears to have violated Rule 702(a1) on the issue of defendant's specific alcohol concentration level as it related to the results of the Horizontal Gaze Nystagmus (HGN) Test defendant performed. However, we do not believe that, given an examination of the entire record, the error had a probable impact on the jury's [verdict]."),
 
 disc. review denied,
 

 368 N.C. 603
 
 ,
 
 780 S.E.2d 560
 
 (2015) ;
 
 State v. Blizzard,
 

 169 N.C.App. 285
 
 , 294-95,
 
 610 S.E.2d 245
 
 , 252 (2005) (medical expert's testimony that when he saw victim shortly after rape allegedly occurred, victim "truly was believable" to him was error but did not rise to level of plain error in light of overwhelming evidence of defendant's guilt).
 

 Conclusion
 

 For the reasons stated above, we conclude that Defendant received a fair trial free from prejudicial error.
 

 NO PREJUDICIAL ERROR.
 

 Judges ELMORE and HUNTER, JR. concur.
 

 [1]
 

 While no GSR was found on Defendant's hands, his absence from the residence for approximately one hour after the shooting would have afforded him the opportunity to take steps to remove the residue from his skin.